[No. 3183.]

J. D. GARTMAN *v.* THE STATE.

PERJURY—CHARGE OF THE COURT—PRACTICE.—Article 746 of the Code of Criminal Procedure provides that "in trials for perjury no person shall oe convicted except upon the testimony of two credible witnesses, or of one credible witness, corroborated strongly by other evidence, as to the falsity of the defendant's statement under oath, or upon his own confession in open court." The accused in this case not having confessed his guilt in open court, it was the imperative duty of the trial court to give in charge to the jury the substance of the above provision of the Code.

APPEAL from the District Court of Bell. Tried below before the Hon. B. W. Rimes.

The appellant in this case was convicted of the offense of perjury, and was awarded a term of five years in the penitentiary as punishment.

The State introduced R. H. Turner as its first witness. He testified that on the first day of December, 1883, a hearing on *habeas corpus,* in the case of the State of Texas v. G. P. Eckels, was held before the Hon. B. W. Rimes, judge of the fourteenth judicial district, sitting in chambers, in the county of Bell. The witness was at that time clerk of the district court of Bell county. The defendant was duly sworn, according to law, as a witness for said G. P. Eckels, and as such testified on that hearing. The testimony of the defendant was reduced to writing just as he gave it on that hearing. The witness produced the written testimony of the defendant as given on that trial, and read from it as follows:

"On the night of the killing I was standing on the sidewalk and saw Mr. Williams coming up the sidewalk, north. He was

between Casey's and Eckels's. I saw him slap a little darkey down and curse him, and come up the sidewalk to opposite Eckels's door; and pull his hat down over his face with his left hand and pull a pistol with his right hand, throw it down, and say: 'G—d d—n you, I'll put an end to you,' and fired the pistol. When he shot at Eckels, he, Eckels, jumped back by the door, and Williams tried to shoot a second time, but his pistol snapped. Then Mr. Eckels pulled out his pistol and shot Williams in the breast. Then he shot Williams a second time in the breast. Mr. Williams then turned around and started to run, and as he, Williams, turned, Eckels shot him in the side, and then Williams fell, and Eckels shot him twice more with his pistol."

The witness Turner testified that the above is a part of the testimony of the defendant on the *habeas corpus* trial of Eckels, which was reduced to writing and signed by defendant.

J. M. Thompson testified, for the State, that he was a State's witness on the *habeas corpus* hearing in the case of G. P. Eckels v. The State. The witness was present and saw and heard the defendant testify in that proceeding.

The State then introduced in evidence the petition of George P. Eckels for the writ of *habeas corpus*, the judge's order on the same, the capias issued thereon, and the return of the same by the sheriff. The State further offered in evidence the indictment against George P. Eckels, charging him with the murder of L. T. Williams, on the thirty-first day of October, 1883, and the judgment of the court rendered on the *habeas corpus* trial of said Eckels.

T. J. Monroe was the next witness introduced by the State. He testified that, on the night Williams was killed by Eckels, he was with Williams, in Wiseman's saloon, which stood about thirty feet south of Eckels's store. He and Williams took a drink of whisky together, and walked out on the sidewalk. This was after dark, between seven and eight o'clock, but lights were burning in Wiseman's saloon and Eckles's store. Witness stopped on the sidewalk in front of the saloon. As Williams stepped out on the sidewalk, some one, witness did not know who, tapped Williams on the shoulder and said: "Let's go." That party and Williams started together up the sidewalk toward Eckels's store. When they had passed the first light in Eckels's store, a man whom the witness took to be George Eckels ran out and commenced firing at Williams from behind,

Williams fell at the third shot. The shooting was very rapid. The first four shots were fired from the same pistol. At this time the witness stepped back into Wiseman's saloon, and saw nothing of the shooting that occurred just after that. This last shooting, the witness thought, was done with a gun. Witness did not hear Williams say anything, did not see Williams have a pistol, nor did he see Williams make any demonstrations at all toward Eckels. Witness had been in Wiseman's saloon with Williams for about half an hour. Williams had passed Eckels's door before the firing began. After the shooting was over the witness saw Williams lying dead on the sidewalk, about twenty feet north of Eckels's door. Witness had taken a couple of drinks that day, but was neither drunk nor under the influence of whisky. He did not see Williams strike a little darkey. He did not see Williams pull his hat down over his face just before the shooting.

Doctor M. K. Lott testified, for the State, that he saw the body of Williams after the killing, and examined it. He found four bullet holes, close together, in the back, three bullet holes, wider apart, in the breast, and one bullet hole in the breast, below the left collar bone. The holes appeared to have been made by pistol balls. The right shoulder was powder burned. The body had been undressed when witness saw it. The bullet holes in the back were smaller than those in the breast. They were blue around the edges, the discoloration being produced either by the balls or the powder which propelled them. The holes in the breast were larger, and were somewhat torn. The impression of the witness was that the balls entered the back of Williams and passed out through the breast. Williams had also been shot in the jaw. This wound, the witness thought, was inflicted by a buck shot from a shot gun. The wounds described were mortal, and were the immediate cause of Williams's death.

Bullet wounds on a body were, as a general rule, smaller at a point where the ball enters than where it emerges. There were four bullet holes in the back of Williams's shirt, but only three in front. The holes in the back were clean cut, but in front they were ragged, with torn edges, the cloth turned out. The vest had four similar holes in the back, and three in front. The coat had four holes in the back, with but two in front. The collar and shoulder of the coat appeared to have been grazed by buck shot, and frayed. A bullet fell from beneath the under-

shirt, having evidently passed through the body, but not the clothing.

S. P. Elkins was the next witness for the State. He testified that he saw the killing of Williams, which occurred on the thirty-first day of October, 1883, in the town of Belton, Bell county, Texas, a little after dark. Witness was standing on the public square, between the court house and the front of Eckels's store, about sixty feet north of the latter point. Witness heard some one speak in the direction of Eckels's store, and looking in that direction, he saw Eckels present his pistol and fire at Williams. Williams fell at the third shot, and Eckels fired at him the fourth time. Williams struggled to a rest on his elbow. Eckels went back into his store, returned with a shot gun, and discharged it once at Williams. He attempted to fire the remaining barrel, but it snapped. He then reversed the gun, as though to strike Williams, but went back into the store, returned, either with the same gun reloaded or another, and fired twice more upon Williams, who was still down. Williams was north of, and had just passed Eckels's store, when he was first fired upon by Eckels.

On cross-examination, the witness stated that he could not tell what were the spoken words that attracted his attention to Eckels's store when the shooting commenced. His impression was that the words "look out" were uttered by some one, but he could not positively swear to that effect. Witness did not see Williams draw a pistol, or attempt to injure Eckels.

John Estes, colored, testified, for the State, that he was standing in front of Wiseman's saloon, and saw the killing of L. T. Williams. Williams walked out of that saloon apparently intoxicated. He brushed against the witness with his shoulder, and passed on until he got opposite Eckels's door, when he, Williams, was fired upon three times. Witness hear nothing said by any body just before the shooting, nor did he see or know who did the shooting. No one was walking with Williams at the time of the shooting. Witness watched Williams as he walked off, staggering, until he was shot.

J. H. Price was the next witness for the State. He testified that he saw the defendant Gartman at the house of his, the witness', father, about four miles north of Belton a few days after the killing of Williams. Witness at that time had heard none of the particulars of the killing, except such as he had read in the newspapers. The defendant then told, in the presence of

witness and others, what he claimed to know about the matter, and to have seen at the time of the killing. He said that he saw Williams walking up the sidewalk toward Eckles's door, and that when he, Williams, got about opposite that door Eckles said to him, Williams: "G—d d—n you, I told you not to shoot him again," and commenced firing upon Williams with a pistol. Defendant further said in that connection that Williams had no pistol, and did not shoot. He said nothing about Williams slapping a negro down. The defendant was passing the night with the witness's father when he made this statement. He made this statement to witness in the presence of witness's father and mother. Defendant was then in that part of the county to fill an appointment to preach at the Rock Church.

William Richardson was the next witness for the State. He testified that he kept a livery stable in the town of Belton. He had a conversation with the defendant about his trouble after his, defendant's, arrest for perjury. The defendant told witness that he was in trouble. Witness asked if he could aid him in any way. Defendant replied that the witness could aid him and deliver him safely from his trouble, and requested the witness to testify for him as he, defendant, had testified on the Eckels *habeas corpus* trial. The defendant, when he made this request of the witness, knew that the witness did not see the killing of Williams. He knew that the witness did not come to Belton until some time after the killing of Williams, and was not in Belton at that time.

W. D. Higgins was the last witness for the State. He gave substantially the same account of the killing of Williams as that given by the previous witnesses.

Sam McWhirter was the first witness for the defense. He testified that he was past sixteen years of age. He was in Eckels's store at the time Williams was killed. As witness stepped into the store he saw Eckels standing in his open north door, facing southward. He tapped Eckels on the shoulder with his hand, and said: "Hello, George," and passed inside. Just then he saw Eckels draw his pistol, and at the same time heard a shot from the outside of the store. This shot seemed to come from a point south of the door, and distant, perhaps, eight or ten steps. Eckels commenced firing toward the outside. The witness thought that Eckels fired two shots southward from the door, one straight out in front, and one northward and downward, as if shooting toward the pavement. The witness thought that

Eckels's pistol snapped several times. After he had discharged his pistol four times, Eckels went into his store, got a shot gun and fired it once and snapped it once. He then got another gun and shot it twice. Witness then ran out at the back door, home, returning after the shooting was over, through the rear of Tom Williams's saloon. He did not see the deceased, Williams, before the shooting, nor while the shooting was in progress. He saw Williams dead, at a point in the direction of which Eckels fired his last shot. Witness did not see who fired the first shot.

George P. Eckels was the second witness for the defense. He testified that he saw the difficulty in which Williams was killed. Witness, just before the difficulty, was standing in the front door of his store, and saw Williams coming northward toward him. He saw Williams pull his hat down over his eyes with his left hand, and with his right draw a pistol. He heard Williams say: "I will put the d—d son of a b—h out of the way." Williams then advanced toward witness, fired his pistol once, and attempted to fire again, but his pistol snapped. The witness thought that Williams was looking at him when he pulled his hat over his face.

J. T. Reese testified, for the defense, that the witness T. J. Monroe was in the habit of getting drunk every time he came to town. He took drinks of whisky in the witness's saloon on the evening of the killing of Williams, before the killing occurred, and was as drunk as usual. Witness saw Monroe take several drinks that evening.

Errors in refusing an application for continuance, in the charge of the court, and in the admission of evidence were the grounds relied upon in the motion for new trial.

*Boyd & Holman,* and *J. D. McMahan,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. "In trials for perjury no person shall be convicted except upon the testimony of two credible witnesses, or of one credible witness corroborated strongly by other evidence, as to the falsity of the defendant's statement under oath, or upon his own confession in open court." (Code Crim. Proc., Art. 746.)

In this case, the defendant not having confessed his guilt in open court, it was incumbent upon the trial judge to instruct

the jury that they could not convict except upon the testimony of two credible witnesses, or of one credible witness corroborated strongly by other evidence, as to the falsity of defendant's statements under oath. This was a part of the law of the case, and a very material part, and its omission was fundamental error. But even if it was not fundamental error, it was error which was excepted to by the defendant at the time of the trial, and must therefore necessarily cause a reversal of the judgment. (Clark's Crim. Law, p. 516, cases cited in note.)

We are of the opinion that the indictment is a good one, and, except the above named omission in the charge of the court, there is no error apparent of record. Because of that error alone, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered May 17, 1884.